May it please the Court, my name is Kevin Kelvan with William Hompson. We represent the appellant Michael Crudder. Michael Crudder was the first African-American male promoted to principal in the 2,125-year history of the Peoria Unified School District, but only after having been passed over for that promotion eight times. On the eighth time, he was purportedly selected for the position, but that was rescinded because two employees came forward with complaints about Dr. Crudder. The first complaint was dealt with within the five-day period under district policy, and it was found not to be true. Dr. Crudder had not acted unprofessionally. On the day that that charge was cleared, a second charge comes forward by Ms. Hessler, which is alleged conduct that occurred five to nine years earlier, and that charge was not dealt with within the confines of district policy and should have been disposed of in the same time frame. There is direct evidence in this case that Mr. Williams, the HR director for racial animus, that Ms. Hessler had racial animus, and there's indirect evidence of Senator Elliott. Sotomayor What is the direct evidence of racial animus? I thought Hessler obviously didn't like your client and accused him of sexual harassment and disapproved of him. And his behavior, what evidence is there that there was any racial component to that? The racial component comes out in her January 2nd report, where the only specific instance of conduct that she can identify is when she gave him a ride to the tire shop to pick up his car. He leaned over, kissed her on the cheek to say thank you, and that was the offensive thing. But she testified in her deposition that when white co-workers did that, when non-African Americans did that, she didn't have a problem with it. The only thing that differentiates Dr. Cruder from everybody else in the district is that he's the only African American. So conduct that she tolerates in non-African Americans, she doesn't tolerate in Dr. Cruder. That's the specific direct evidence that Ms. Hessler ---- But that really wasn't the only thing she said. I mean, she, as I recall, said, sort of told that story a bit in passing, and more generally said that he was making remarks to everybody, including to her, and said who she thought he was making the remarks to and some general sense of what the character of those remarks were and so on. Well, there's two versions. There's the December 17th, 2007 version of her initial report, which doesn't really contain any specifics other than that Dr. Cruder, on an almost daily basis from 1999 to 2003, made remarks that she considered to be of a sexual nature to multiple women. And just on its face, it's just not plausible that for a period of four years on a daily basis he was sexually harassing women and nobody spoke up. And that she waits until five years after she's been working with Dr. Cruder, I mean, that's a long gap of time, and comes forward and her letter specifically says that her intent is not to root out sexual harassment, but to make sure Dr. Cruder doesn't get the promotion. Well, just because she doesn't, I mean, there has to be evidence that there's racial motivation for that to matter. I mean, if somebody doesn't like somebody else or they object on the ground of sexual harassment or harassment, however you want to pronounce it, that doesn't count in this context. So just to say she didn't want him to get the job, which seems true, doesn't make that make sense. Well, you have to look at the reason why she didn't want him to get the job, because the charges of sexual harassment don't hold up. The district does an investigation, and, in fact, Dr. Stankearly specifically testifies they didn't believe Dr. Cruder was a sexual harasser. Well, what they believed was that he said things to people, some of whom took offense to it and some of them to those whom didn't, that they were vulgar. Well, there's a – vulgar doesn't necessarily mean sexual. There was a lengthy conversation with her about the meaning of sexual harassment and that it had to have a sexual component before she was asked the questions about whether these things were said. So in context, wouldn't the natural understanding of this be that they were vulgar in a sexual manner, even if you don't take vulgar to mean sexual? They would be, except that at the conclusion of the investigation, Mr. Williams finds and Dr. Stankearly agrees that Dr. Cruder was not a sexual harasser. The charges that she brings were not substantiated. And, in fact, the district court finds that Dr. Cruder did have a promiphasy case of Title VII discrimination and retaliation. So obviously, he at least thought there was evidence of racial animus in the record. You know, aside from all that, my problem with this case is Dr. Cruder got the job as principal pretty soon thereafter. He is a principal, and it's a little hard to figure out exactly what's bothering him. Well, he didn't get the job at Bustancia. He got a different job, and it was six months or so later. And by that time, he had already filed his charge of discrimination with the EEOC, and he had done a notice of claim that put them on notice that he was going to be suing them for racial discrimination. But the – in December of 2000 – Okay, it's about attorney's fees at this point? What's it about? What does Dr. Cruder want? What Dr. Cruder wants is to be treated the same as everybody else in the district. All right. So what does he want? He wants an injunction saying he'll be treated the same? He wants the finding that the district discriminated against him on the basis of race. He wants the recognition that he should have gotten in December of 2000. There has to be an adverse action resulting in actual harm for there to be a cognizable claim. What is the specific adverse action? There are – well, there's two things. In December of 2007, they withdrew his – well, I say withdrew the recommendation. He was never actually recommended to the board for the promotion in December 2007. The same day that Dr. Santorelli says he made the decision to recommend Dr. Cruder, the allegations came out, and then Dr. Santorelli said, well, I'm not going to make the recommendation. So that's the first adverse action. The second adverse action, just based solely on Ms. Hessler's and Ms. Kachlow's complaints, he loses the promotion. Without even an investigation, they impose the penalty that he could only have been imposed if they found truth to the allegations. Both allegations turned out to be false. If this is the same superintendent who ultimately promoted him? That's not correct. The second time around, in May of 2008. Or recommended him? There's a selection committee. There were five openings in May. Five names were given to Dr. Santorelli. He had no choice but to pass all five names along because there were only five openings. And in May, the discussion gets tabled for all five. A week later, the four Caucasian candidates get their promotion. And then there's a further week delay before Dr. Cruder gets his promotion. And this is the second sort. So it's one week. You're running one week of pay. Well, the lawsuit could go back to December of 2007, but the what happens after that week delay is, well, there's multiple things in that process. Purportedly, the Board asked to see Dr. Cruder's history. Under district policy, the history should have been two years back. Well, do you think that hiring a principal, it makes sense to throw out everything one knows about this person over the last two years? Is that what the policy could have meant, that you don't look at the person's whole career to decide whether he's fit to be a principal? You don't look at his disciplinary records. You can look at his accomplishments. All right. You can look at the information and underlay the disciplinary matters, i.e., that he did this or that or the other thing. But the things that they brought forward were from Mr. Williams, what he calls his secret file, that he maintained on Dr. Cruder in violation of district policy. That information should not have been available for Mr. Williams to present to the Board in 2005. And somebody couldn't, of their own memory, quite aside from what was on the piece of paper, say that, you know, there have been a lot of allegations over the years against Dr. Cruder of X, Y, and Z? Well, all that information would have been available to the committee in 2007 that actually recommended Dr. Cruder. So whatever was in his file in 2007 obviously wasn't a bar to his promotion. And then, obviously, even with the additional false allegations that were brought out in December of 2007, that wasn't a bar. So there really shouldn't have been. I mean, that's the charge of the committee who does the selection process. So the reason the Board is asking for this information is unclear. I want to go back to something that you said right at the beginning, and I haven't had a chance to circle around to it. And I asked you about Ms. Hessler, but I haven't asked you about Santorelli because I think in your opening you said that there was direct evidence that he bore a racial animus, and I didn't see that. And I'd be interested in what you're referring to. I said there was direct evidence of Mr. Williams. Oh, okay. And indirect evidence of Dr. Santorelli. Okay. What's the evidence about Santorelli? He was the one who promoted him, right? Ultimately. No, ultimately he just passed along the committee's recommendation. He didn't really have any discretion. When they only give him five names and there's five openings. Well, he did it. Regardless of whether you think he had a good reason or no reason, he did. But until the Board makes the determination, there is no promotion. Okay. What's any evidence at all about his state of mind on this issue? Well, the evidence would be that in December of 2007 when Ms. Hessler makes her complaint, and he's testified to this, that there's a district policy and those investigations are supposed to be done in five days. On its face, even if what she said was true about the incident in the car, even if it was true about, even if you can believe, which at summary judgment you don't have to, in fact, it would just be drawn in Dr. Gu's favor, about all the talk that had happened four or five years ago, or five to nine years ago, that's not a Title VII charge anymore. There's, there's, it's too, they're just too stale. In fact, when Ms. Hessler. That's not the question. The question is whether this person should be a principal. The question isn't whether it's a Title VII charge. No. The question, the reason they did the investigation is they thought they were investigating a potential sexual harassment liability. They weren't investigating whether this man should be a principal even on an interim basis? Well, that's, that's not what they said. What they said was they were investigating a sexual harassment charge. But the only reason for investigating was to determine whether he should become a principal. They weren't just randomly investigating him. The determination that he should become a principal had already been made by the, by the committee that recommended him. Dr. Santorelli said he was going to be the choice. The, the committee already knew Dr. Kruger's history. They knew about the, all the instances that were of record. And, and much of the. They're now saying that they couldn't know because they weren't allowed to look in the record. Well, they were, they were allowed to know what was in his, his personnel file. For the past two years. For the, well, no. They have his whole work history. The only, two years back, only on disciplinary history. Disciplinary history is supposed to be removed. If he had been on an improvement plan and met the improvement plan, which presumably he did because he got his performance bonus every year and he got retired every year. There had been an earlier incident in which he was found to have improperly taken somebody to his apartment who did accuse him of sexual harassment. Were they allowed to look at that? That was within two years. That was within two years. And that was proven, there was no, that was unsubstantiated as well. And he only got a letter of direction for taking someone to his house during business hours. There was nothing in there about sexual harassment. In fact, in, in his entire history, there's never been a proven charge of sexual harassment, which, which makes what happens in May, after he finally gets the job, they, they impose conditions on his employment. This would be the second element of damages on him that nobody else was subjected to. There's the zero tolerance policy. What's the damage from being told, please be careful, don't do these things that are already a matter of not doing them by policy? It's just a reminder about the existing policy. Why is that an adverse employment action? That's not what they did. They didn't remind him that we, that, that you should not engage in sexual harassment. Regardless of how you characterize the writing, what damage flows from that? Because every day he goes to work with this little sword hanging over his head that says if, if there's, because it wasn't, they didn't say if you engage in sexual harassment, they say if there's another allegation of sexual harassment, as though he has some control over women coming forward with more false allegations. That's a different standard. And he, they didn't do this. The case says that something like that constitutes an adverse employment action. I don't, I don't have a case specifically that says that's an adverse employment action, but the district courts. What's your best case that shows that, that. It's just the definition of Title VII. It's a different. That's not what I asked you. What's your best case to demonstrate that simply being, giving, given the promotion that you've asked for, but cautioning you to behave well is, is an adverse  I don't, I don't have a case off the top of my head, but the statute says if you're subjected to different terms and conditions, the other four principals who were Caucasian weren't sat down and reminded, now that you're all principals, we expect, we expect you to model good behavior, and we don't want to. Were they accused of sexual harassment also? So they were similarly situated? We don't know what their historical record would be, because we were not provided that information. Well, is that a way of saying that the record doesn't show that they were similarly situated in that respect? Well, the record also, with all due respect, the record doesn't show that Dr. Cruder ever engaged in sexual harassment. He was, there were accusations, but none of them were ever substantiated. I didn't ask you about substantiated. I asked you if they were similarly situated in regard to having been accused of sexual harassment, so that they would be considered similarly situated. And if the record doesn't show, the record doesn't show. The record doesn't show. But isn't the real problem that it isn't a question of whether he was accused of sexual harassment in a legal sense. The question is whether they had a basis for thinking that he was behaving in an unprofessional manner in some instances in ways that had a sexual overtone, even if there were sexual harassment in a legal sense. The lack of plausibility in Ms. Hessler's accusation is that in that same time frame, there were eight letters of recommendation, including her own, that lauded his professionalism for all those years. But in fact, it was substantiated. When they went and spoke to a bunch of teachers in the school, as I said earlier, I mean, most of them did substantiate that he said things about booties and other things, and some of them said, but it was just a joke. He didn't bother me. And other people said it bothered them. But certainly the school could take the position that he shouldn't be doing this just because it was bothering some people, but even if it wasn't sexual harassment in any legal sense. But if it was – but that's the whole point. They're treating it like sexual harassment, and they put him on a zero-tolerance policy for sexual harassment or allegations of sexual harassment. So if the problem is he's lacked some social grace in dealing with people in the workplace, that's different than accusing him of sexual harassment. And that was dealt with at the time. He had been on improvement plans for that. He had dealt with those. And that is so old that even Mr. Williams concludes this information is too stale to impose any discipline. But I'm – You've exceeded your time, but we will – we've used an awful lot of it, so we'll give you some rebuttal time as well. We'll hear from the school district. I may have pleased the Court. Gordon Lewis of Jones-Skelton-Hockeley here on behalf of Peoria Unified School District. Do you speak a little louder, please? I will try. I apologize. I'm battling a cold. Oh, well, sorry. I may have to cough on a couple of occasions. So I will try to use the microphone. You need some cleaner. No, I'm doing okay. And I'm here on behalf of Dr. Denton Santorelli, Dennis Williams, Michelle Hausler, and Peoria Unified School District. And these defendants are asking the Court to affirm the district court's grant of summary judgment in this case. And there are really two questions on this appeal. First, whether it was unlawful race discrimination when the superintendent decided to rescind Dr. Crutter's promotion recommendation so the district could meet its legal obligation to investigate sexual harassment complaints. And second, was it unlawful retaliation under Title VII for the district to take an additional week to evaluate Dr. Crutter's promotion or for the superintendent to counsel Dr. Crutter on the importance of having a work environment that is free from sexual harassment. Now, on the first question, summary judgment was properly granted because the district court correctly found that Dr. Crutter failed to show a discriminatory motive on the part of the decision-maker. So it's undisputed that Dr. Denton Santorelli, the district superintendent, was responsible for making promotion recommendations to the board, and that Dr. Santorelli chose Dr. Crutter to be promoted to the stancy of the position. Alito, if I understood Mr. Cobell's argument, I think he was trying to say that there was some committee that was actually the decision-maker, not the superintendent. Can you clarify that for me? The committee makes recommendations to the superintendent, but it's ultimately the superintendent who makes the recommendation to the board. It is the superintendent on whose ultimate responsibility it is to make recommendations to the board. And in the first instance in December, the committee presented two candidates to Dr. Santorelli, and Dr. Santorelli chose Dr. Crutter as the candidate that he was going to promote to the stancy position. That's undisputed. And I gather this was all being done in a rather rushed way because some principal had left kind of unexpectedly. Well, there was an unexpected retirement, but for the process of convening a selection committee to make recommendations to the superintendent, having that committee interview candidates and bring two candidates to Dr. Santorelli, and for Dr. Santorelli to decide that Dr. Crutter would be the candidate that was advanced. But one thing one might ask otherwise is, in fact, this investigation was completed, you know, in a matter of weeks anyway. And apparently it was not viewed as disqualifying the result because he was then given the position, a parallel position sometime later. So, I mean, one question is, well, why couldn't they wait the three weeks? I mean, why did they have to move so quickly? I understand that the policy says five days if possible. All right. It wasn't possible, let's say, because they were talking to a lot of people. They seemed to have done it pretty expeditiously. And why couldn't they have waited? Well, and actually, when the allegation arose, the school was in winter break. And so they had to wait until the completion of winter break before getting additional information, being able to have the teachers who they wanted to interview on campus. But they didn't need a principal when there was nobody there either. Well, but when campus started, Dr. Santorelli decided that he would put an interim principal in place on the campus. And after he did that – Is this the Vistancia? This is the Vistancia. So we're talking about the circumstances from December 2007 and moving into January of 2008. But it was Dr. Santorelli who made the decision to recommend him initially. It was Dr. Santorelli who made the decision to rescind the recommendation so this investigation could be – the investigation could be conducted. And when the investigation was completed, and they determined that Dr. Critter had made inappropriate comments towards women on campus, but that those comments would not preclude Dr. Critter from becoming a principal, Dr. Santorelli decided that he did not want to disrupt the Vistancia campus. He would leave the interim principal in place. And he, again, recommended Dr. Critter for promotion at the next available opportunity. So on these facts, the district court correctly applied the same actor inference to Dr. Critter's discrimination allegation and rejected his race discrimination claim. Dr. Santorelli made the decision to recommend him. Dr. Santorelli made the decision to put an interim person in place when the harassment claim arose. Dr. Santorelli made the decision to keep the interim principal. Kagan. And the only other piece of this that gives me any pause is that the – when they had this meeting with him, when – after they appointed him, they at least slightly misspoke, it seems. I mean, they didn't really mean that if – I hope they didn't really mean that if anybody makes an accusation, you're out of here, as opposed to if anybody makes a substantiated accusation, you're out of here. But they did say the first, I think. You know, what – what Dr. Santorelli remembers communicating in the meeting was that principals were held to a high standard of conduct, expecting to meet those standards. The record reflects that Dr. Santorelli has – Dr. Santorelli has testified in declaration of the record that Dr. Critter is not subject to a zero-tolerance policy and that if new complaints of harassment arose, they would be investigated and dealt with consistent with district policy. Kagan. So essentially this notion that he's under – He's talking about his affidavit, page 3, paragraph 10. I believe that's – that is correct, yes. So that he doesn't have – your representation is that he does not have a sword over his head, that the only sword is the usual sword, which is if you do something that's improper, you can be disciplined for it. And as – with respect to that issue, as the Court already observed, Dr. Critter is not similarly situated to the other candidates. Before we leave this issue that you've been discussing with Judge Bersanbo, let me ask you. It's clear that Santorelli says there's no such thing as a zero-tolerance policy, but we're on summary judgment, so we have to take everything in the light most favorable to the plaintiff. If he understood it to be a zero-tolerance policy, where does that leave us in terms of summary judgment? Well, even if he incorrectly understood it to be a zero-tolerance policy, you still need to move to finding that giving him that statement constitutes unlawful race discrimination. And it's Dr. Santorelli who tells Dr. Critter about the policy in however he understood it or how Dr. Santorelli. Right. Because his affidavit at page 9, paragraph 92, says he was – although it doesn't say who said it, the implication is that it's Santorelli. I was called to Dr. Santorelli's office and told in the passive voice there would be zero-tolerance of any subsequent sexual harassment allegations. Okay. But – So that's his version of the meaning, which we have to accept. Well, but still for Dr. Santorelli, the same accurate inference applies. Dr. Critter recommended him again for promotion to principal. Santorelli recommended him. Santorelli recommended Dr. Critter for promotion. And so in order to attach racial discriminatory animus to Dr. Santorelli, there would be an extremely strong showing of discriminatory intent on Dr. Santorelli's part when he makes this statement. And there's no evidence of discriminatory intent on the part of Dr. Santorelli in this case. Indeed, Dr. Santorelli had made the recommendation for Dr. Critter to be a So even if you took Dr. Critter's interpretation of the alleged zero-tolerance policy as, you know, as correct, there's still not evidence of racial discrimination, racial discriminatory motive, or a motive for retaliation that would – that would support presenting this case to the jury under the same accurate inference. Mr. Lewis, as I understood Mr. Cokel's argument, he alleges that there is direct evidence of racial animus on the part of Mr. Williams and then through Williams indirectly to Dr. Santorelli. Williams, I take it, is an assistant superintendent? Dennis Williams is the director of human resources, but, you know, candidly, I do not know of anything in this record that would give direct evidence of a racially discriminatory animus on Dennis Williams' part. And what was Mr. Williams' role, if any, in Dr. Santorelli's decision to first, I'll call it, stay the promotion while the investigation was being conducted and then ultimately recommend him for the principalship? The decision to stay the initial recommendation was Dr. Santorelli's decision, and while Dennis Williams was the individual who conducted the investigation, it was Dr. Santorelli who decided that the matter needed to be investigated and that an interim principal would be put in place at that time. Now, on appeal, Dr. Critters is sort of attempting to avoid summary judgment by asserting the cat's paw theory of liability, sort of claiming that the teacher's sexual harassment complaint was so motivated by racial animus and the teacher so influenced Dr. Santorelli's decision that her animus or alleged animus must be imputed to the district. But the cat's paw liability in this case fails for several reasons. You know, first, Dr. Critter waived the argument by failing to assert. I must say that for myself, I'm not persuaded by that piece because it seems to me that it's implicit in the way the facts were argued at the district court level. You don't have to use the phrase to raise that issue. So what are the reasons? I understand, Your Honor. Now, in my reading of the pleadings, not only did he not use the phrase, but there was no discussion of Michelle Hauser's racial animus influencing the process or other types of statements that would have brought it to bear. But I will move on to other points. The second is that cat's paw liability does not apply because the teacher is not an agent of the school district for Title VII purposes. In the Staub v. Proctor case in the Supreme Court, in the Poland v. Chertoff case here on the Ninth Circuit, the standard for cat's paw liability requires action by a supervisor. Title VII liability is based on agency principles. You know, it's only supervisors who are agents of an employer for purposes of imposing liability for adverse actions. And here the person who filed the harassment complaint is a teacher. She had no supervisory authority over any district employees. She certainly didn't have supervisory authority over Dr. Kruter. So she's not an agent of the employer for Title VII purposes, and her actions can't create liability under Title VII for disparate treatment. But if she said something in motion that is motivated improperly, that could potentially result. If the supervisors do what she says, for example, and they're doing it because she said it and her reason is racial, the supervisors could still be projecting the district to liability. Well, you know, for actions that are, could be described as disparate treatment under Title VII, you know, both Staub and Poland talk about a supervisor's discriminatory animus. Your position on that question is no, they couldn't be. My position is yes.  The question is, is it similar to the difference between co-employee sexual harassment and supervisor sexual harassment? It is somewhat similar, yes. That for a co-employer circumstance under the law. There has to be knowledge. Yes. There has to be, there has to be knowledge and a failure to act in a reasonable matter under the sexual harassment. So if they knew, if the supervisor knew that Ms. Hauser was racially motivated, that would be one thing. That would be one thing. But there's no evidence of that in this case. And they would have to know and then, you know, act in a manner that is irresponsible under, for sexual harassment. Now, this is different than sexual harassment circumstances because, you know, this  the employee. And even under the Pollen v. Chertoff case, you know, the employer is only going to be liable if the biased employee influenced or was involved in the decision-making process. That's at 494-F3RD-1182. And here, apart from making the complaint, you know, the allegedly biased teacher was not involved or influencing the process in any way. And what's striking is that she ultimately got what she wanted, right? I mean, he's not the principal at her school. Yeah. But if you're going to have an adverse employment action that is taken for reasons that are unrelated to the supervisor's original biased action, then the employer is not liable. That's the Staub case at 131, Supreme Court Reporter 1193. And here you say the reason was because they had to have somebody there. They, you know, the, you know, as we discussed, the investigation did not result in affirming her allegations and disproving Dr. Cruder's ability to become a principal. Instead, they said this will not preclude you from becoming a principal, but Dr. Santorelli independently decided that he did not want to disrupt the campus by removing the interim. So the reason that Dr. Cruder was not immediately made the principal at Vistancia was not related to the teacher's allegation that he is a sexual harasser. You have used up your time. I've used my time. Thank you, counsel. Mr. Koldell, we used a lot of your time with questions. You may have two minutes for rebuttal. Thank you, Your Honor. Staub doesn't limit its analysis to supervisors. They frame the question in terms of under circumstances under which an employer may be held liable for employment discrimination based on the discriminatory atoms of an employee. And footnote for this specifically declined to reach the issue of whether it applies to coworkers. The Tenth Circuit in BCI v. Coca-Cola found that it did work with coworkers, and they cite in their support from other circuits for the same proposition, including the Third, the Fifth, the Sixth, the Seventh, and they even have in that footnote an older Ninth Circuit case that makes a reference to Cat's Ball that wasn't part of that case. So that analysis does apply. Circuits have been applying it to coworkers. And in this case, Ms. Houser was the de facto decision maker. She made the complaint, and based on that complaint alone, Dr. Santorelli took away the promotion without any investigation. He, in essence, delegated that decision-making to her, and under the Staub analysis, that's sufficient to get you to the Cat's Ball analysis. Let me see if you can explain the facts behind that. You're saying that once she made the allegation, someone else was appointed and the decision was made that Crotar wasn't going to be appointed as soon as she made the allegation? Correct. He was the group. Rather than what's being portrayed by the district, which is when after, as I understand what they're saying is, they had to have somebody in place, they put somebody in place, they conducted the investigation, then they visited the question of whether to further disrupt the school by making another appointment now and decided, no, we're not going to do that. Well, consider him for the next appointment. And there's two parts to that, what they did that are inappropriate. One is they could have put Dr. Crotar in the position while they did the investigation, and two, under district policy, if they had completed that investigation timely, they wouldn't have the problem of the interim guys have been in there for three weeks now. Dr. Santorelli and Mr. Williams both agree five days is the appropriate time to do the investigation, and in this case, because most of these allegations were so stale, in fact, Mr. Williams concludes they couldn't impose discipline because the allegations were so stale. Well, they knew that on December 17th. They could have reached that conclusion in five days. They didn't need to take three weeks to figure out that these allegations were so old they couldn't be substantiated. That's, I mean, that's where the caspol liability comes in. Thank you, counsel. We appreciate the arguments of both counsel. The case just argued is submitted, and we are adjourned.
judges: Graber, Berzon, Tallman